# CHESAPEAKE BEACH RAILWAY COMPANY *v.* BREZ.*

NEGLIGENCE; SCENIC RAILWAYS; EVIDENCE; PRESUMPTIONS; QUESTIONS FOR JURY.

1. If the death of the plaintiff's intestate may be accounted for. by two in-

---

*Negligence.*—On presumption of negligence from injury to passenger, see note in 13 L.R.A. (N.S.) 601.

ferences from all of the facts given in evidence, the issue of negligence is properly submitted to the jury.

2. It is the province of the jury to reconcile any conflict in the evidence, and to draw the proper conclusion from all the facts and circumstances.

3. The fact that a party produces weaker evidence, when it is within his power to produce stronger, creates a presumption that the stronger evidence would have been to his prejudice.

4. That a passenger on a scenic railway was hit by a piece of the superstructure as it fell, causing him to be struck, and killed by coming in contact with some part of the scenic railway, raises a presumption of negligence in the operation of the railway. (Distinguishing *Weaver* v. *Baltimore & O. R. Co.* 3 App. D. C. 436; *Kohner* v. *Capital Traction Co.* 22 App. D. C. 191, 62 L.R.A. 875.) (Mr. Justice VAN ORSDEL dissented on the ground that the evidence failed to show that the death of the intestate was so caused.)

5. A railway company conducting a pleasure resort in connection with its railway is liable for the death of a passenger due to the negligent operation of a scenic railway under the ostensible management of a hotel company, controlled as one of its departments by the railway company, which paid the salaries of those employed in the hotel or amusement service, and advertised the place as a pleasure resort.

No. 2281.   Submitted January 3, 1912.   Decided May 30, 1912.

HEARING on an appeal from a judgment entered by the Supreme Court of the District of Columbia on a verdict rendered by a jury against the appellants in an action to recover damages for the accidental killing of the appellee's intestate.

*Affirmed.*

The COURT in the opinion stated the facts as follows:

On August 12, 1908, Coleman Brez was killed while riding as a passenger on a scenic railway at Chesapeake Beach, in Calvert county, Maryland. He was forty-six years of age, and died intestate, leaving a widow, Ray Brez, and six children, the youngest of whom was a daughter twelve years of age. The estate was administered upon by the widow, who, on August 9, 1912, brought this action for damages, under the provisions of a Maryland statute which is, in substance, similar to the stat-

ute of the District of Columbia authorizing such actions. The declaration is in four counts.

Omitting the introductory averments, count 1, after alleging that upright posts supporting the superstructure were maintained in close and dangerous proximity to the track, charged that while intestate was being carried at a reckless rate of speed, the car was negligently jolted so as to bring his head in contact with one of said posts, without negligence on his part, thereby causing his death.

Count 2 charges that defendants negligently failed to keep said structure in repair, by reason of which a crossbeam, or some other object forming a part of the covering of the way, negligently fastened, fell and struck intestate while riding as a passenger. Count 3 is in substance a repetition of count 1. Count 4 charges generally negligence in the construction and operation of the scenic railway, which caused the death of intestate.

The evidence produced by plaintiff tended to show that intestate was employed as a cutler by the United States Department of Agriculture, with a salary of $100 per month, and that in addition maintained a general shop at his home, through which he earned from $75 to $100 per month. He was a strong vigorous man. The family visited Chesapeake Beach, which is a summer resort, on August 12, 1908. Intestate and his youngest daughter took seats in a car for a ride during the afternoon. His wife and other children awaited their return in the ticket office. The train consisted of two cars under the control of a gripman, who sat in an elevation between the two cars. There were five passengers in the first car, and five or six in the second one.

A witness, A. N. Waddell, who sat in the seat directly in front of intestate and his daughter, testified as follows:

Q. Tell us in your own way what happened after that car got started.

A. Well, after we left the starting point and made this circle, and pulled up and down the incline and decline until we went through the tunnel, and were on our way back eastward, until we were coming under the superstructure, where there is a slight

reverse curve. The tracks run around to go on the other track. There was a flash of some kind. I don't know what it was; but it appeared to be something falling. I dodged it. I dodged down between the seats like, and then I heard the little girl holloa "My papa is killed." Now, what this was falling, or anything like that, I cannot say positively; but there was something there that made me dodge, and it had the color of a piece of the superstructure at that time, which I think was a light pea green. I am not really positive about that, but anyhow it fell there, kind of catercornered across the left of the car, and it made me go that way (indicating) dodging.

The walk along side of the track was about 14 inches wide. Deceased was lying in this space dead when witness got to him after the car stopped. It was in his opinion some 60 feet before it stopped. Asked on cross-examination if he saw the object that flashed, he said: "I could not tell you; but it was a flash of something. You could almost hear the swish through the air from it. I don't know what it was. I know I dodged it to save myself, and immediately I dodged it, I heard the little girl holloa." He heard nothing strike, heard nothing crack just before the object fell. His impression that it was pea green was because the structure was painted that color.

Philip Kronheim, another witness for plaintiff, testified that he was in the front seat of the first car. Waddell sat behind him, and deceased and his daughter on the back seat. At the place where there is a decline followed by a rise, near where the tracks cross, one above the other, in the language of the witness, "there was a flash came across like that, and I kind of moved, and, of course, after that I heard the little girl holloa, 'My father is killed.' I don't remember anything after that. I don't say that anything struck him, or anything like that. I don't know that. I got hold of my wife and little girl. She was sitting next to me and I got hold of her, naturally so she wouldn't get scared and jump out, or something." He said, further, that when this thing flashed, and he dodged his head, the car was going at a medium rate. The decline brings the car upon the following rise in grade. The brakeman put on

brakes, and the car went, maybe, 100 feet to the turn. Couldn't tell what was the thing that flashed by. Something came by. Couldn't state what it was. It was all over in a second. It wasn't a second between the flash and when I heard the little girl cry out. It wasn't a second." Cross-examined, he said he noticed the flash. He did not know whether it was something big or small. Did not know the color. Heard no object strike anything about there. Re-examined, he said the cars naturally make a little noise. His wife was ill, and could not be present at the trial. His daughter was only five years old. Several passengers described the condition of deceased from an examination of the body after removal. The left side of the skull and over the eye about the median line was crushed. Over the right eye was crushed. One said the skull was crushed over the frontal bone and the median line. The left eye was blackened, on the left portion of the head the skull was mashed. Entire face was bruised both on the right and left side. Evidence tended to show that the distance from the track to the upright posts carrying the superstructure of the overhead tracks is 18 inches. The board walk between them and the track is 13½ inches wide. The upright posts are 7 feet 5 inches apart.

William M. Heinlein, a witness for plaintiff, was in the second seat of the second car. Saw deceased in the first car. Had his arm around the little girl grasping the handle on her right side. Where we got up with the other rail overhead, it is rather open and gives you an open view of the ground. Deceased "seemed to look this way (indicating as if he were looking somewhat over in the ground)." His arm was around his daughter. "I saw him strike the stanchion, and as he struck the first one his body was limp like that, and he struck the second one, and it pulled his body right out. He dropped beside me on the running board; lay on his left side." Don't think his body turned at all as he looked out. His head turned, just as a person would turn to look out of a street car, similar to this (indicating). I think his head struck a stanchion (one of the upright posts). When he struck the first stanchion his body relaxed and he went over; before the car stopped he struck the

second one. He was not slouching; was sitting very firm. Don't know whether he was sitting very erect, but he seemed to be sitting very firm on the bench. During the whole of the ride he had his arm around his daughter, holding to the rail outside her. Cross-examined, the witness repeated that deceased was sitting firmly in his seat; was not lounging either way. No part of his body projected beyond the line of the car. We were travelling east, and if a man wanted to look at the mainland he would have to turn all the way around and look back.

Harry M. Reynolds, a witness for the plaintiff, was sitting in the third seat of the second car. Did not see deceased when struck the first time. Before he was struck the second time, his body was half way out of the car; "he had lurched forward and fallen down into the foot space; he had practically fallen out of the seat when I saw him; he slid down after he was hit. He had gone forward and fell this way. He looked like a man would fall who was perfectly helpless and had no use of himself at all. Remember this was the second time. I did not see him the first time. Somebody holloed, and, of course, that attracted my attention, and I immediately looked, and then Mr. Brez was part way out of the car." The car was nearly up the incline and stopped about 25 feet away. Cross-examined, witness said he did not notice any object drop from the superstructure and flash across the car just before the accident. Impossible for him to see Brez all the time, as there were people between them. Did not see him until he heard the scream that attracted his attention, at which time his body was half way out of the car with his body down between the seats, and has no idea what caused him to get in that position. He could hear the blood dripping through the cracks into the water below. Other testimony tended to show that the structure was largely over the water of the bay, and that the place where the death occurred was over the water.

Roy Ricks, a witness for plaintiff, testified that he had ridden on the train preceding that on which Brez was. Went back to see what was the matter. The body was being borne away. He noticed the posts on the side supporting the superstructure and

saw blood upon one of them. After the accident the railway was stopped and no one was allowed to go up to the place of the accident.

Defendant introduced a witness, Ellen Reynolds, wife of Henry M. Reynolds, who had testified for the plaintiff. She was in the second car with her husband. Saw Brez and his daughter get into the back seat of the first car. As the train had almost finished the first round, noticed that Brez's shoulder projected a little; noticed him closely. "He did not readjust himself, and he went out a little more, and it was there that he was struck in that way (indicating by two slaps)." The post struck him. Did not notice a jolt, lurch, or unusual movement of the car. Saw nothing fall from above, and saw no flash. Cross-examined, the witness said that the motorman was between her and Brez. Did not notice whether he had his arm around his little girl. "The first thing she noticed he dropped down in his seat (indicating) and then dropped a little more, and then was struck by the post; that she could not tell how long before he dropped down in his chair in that way that he was struck by the post." Car was going at its usual speed. "He went down that way, and then went down again (indicating), and then his head was struck by the post; it struck him so hard that the blood from his head came all down over witness's suit."

Harry Ferry, for the defendant, said that he was in the next to the last seat of the second car. Did not see him hit; saw him after he was hit and dragged out of the car. The first he knew of the accident was just when he saw him dragged out of the car. Did not see him when he was hit. The upright hit him. There was no jolt or unusual motion of the car. Did not see or hear anything fall from above. Heard the blow as the man's head struck the upright. Cross-examined, he said that Brez hit only one upright. Heard something hit, looked up, and Brez was being dragged out of the car. His body seemed to fall out. Did not hear Brez hit twice by any upright.

James R. Heflin, a witness for defendant, said he was on the ground at the water's edge watching the cars go back and forth. Saw a man "kind of get up this way (indicating) as if he want-

ed to see someone down below on the platform, and his head come in contact with this upright piece." He fell opposite the car. Somebody picked him up. "I went down there, but by the time I got down there they had roped him off and would not let anybody up there any further. Observed nothing unusual about the motion of the car. He was looking directly out of the car as it was going in. Saw no object fall from the railway structure. Saw nothing fall on the beach near the water. Only noise heard was when deceased's head come in contact with the piece. It sounded like a pistol." Cross-examined, the witness said the car was going in at the time; could not say if the car was 200 or 300 feet from the shore, and could not say which car the man was in. It appears from the evidence that Knott, the man who acted as motorman or gripman on the cars at the time of the accident, was in attendance upon the court under subpœna by defendant, but was not called to testify.

The evidence relating to ownership, management, and operation of the scenic railway tended to show that D. H. Moffatt, of Denver, organized the Chesapeake Beach Railway Company, to run trains between Washington and Chesapeake Beach, the principal business of which was carrying passengers to and from the summer resort. Moffatt owned 83 per cent of the capital stock. He organized the Chesapeake Beach Hotel Company in 1899, to operate a summer resort at the said beach. Its capital stock is $100,000, divided into 200 shares, of which Moffatt owned all but ten; the ten were necessary to qualify the five directors of the company. The two corporations had the same president, secretary, treasurer, and general manager, and had a common office. In August, 1908, the Chesapeake Beach Railway Company had standing advertisements in all of the daily papers of Washington, announcing excursion rates, new attractions, music and dancing free, etc. The charges were paid by said company. Minster's band or orchestra furnished the music at the pavilion on the board walk near the hotel and the scenic railway. It was employed and paid by the Chesapeake Beach Railway Company. The bank account was kept in the Riggs Bank, Washington, in the name of the

railway company, and all receipts were deposited to that account. One Donald acted as superintendent of the summer resort for the hotel company in the summer, as he testified. He collected the receipts of the scenic railway and rentals of stands and turned the same over to Mr. Waters, who was treasurer of both corporations. During the winter season, until the opening of the amusement places May 30, Donald acted as station agent and telegraph operator for the railway company at the beach. His wages as superintendent were higher. These were paid by check of the treasurer of the railway company, on the Riggs Bank. The employees under him were paid in the same way. John Knott, the gripman of the car, was in the employ of the railway company as car cleaner, receiving $10 per month therefor. In the afternoon he was gripman on the scenic railway, at $45 per month. He was paid by a like check. Donald produced three pay rolls for August. Each was on a printed blank of the railway company. Roll No. 12 contained names of the engineer, laborers, gripmen, etc. In the blank space under the head of "department" were the written letters. "C. B. H. Co.," reported by J. E. D. Knott's name is on the same. It is certified by "J. E. Donald, Supt. of Resort," and approved by the auditor and general manager. Roll 13, on a similar blank, has "police" written after department. It contains the name of John Knott as watchman. Others are policemen. This was certified by Donald, and approved as was No. 12. Roll 4 for August had "machinery" entered after department. It contained a list of car cleaners, among them John Knott, and was certified by W. J. Hayward, superintendent, approved as were the others. Donald testified that the "C. B. H. Co." meaning hotel company— was written by him to identify the pay roll. It was turned over to the treasurer, Waters. Attached to that roll was a discharge check on printed blank of the railway company, showing discharge of a gripman in August and the wages due him, signed "J. E. Donald, Supt. of Resort." The blanks were furnished by the railway company. Donald testified that he used them because he had no hotel stationery. A similar dis-

charge check for a policeman was produced. It was signed by Donald, who wrote police department in the blank space therefor. He got checks from the railway company in payment of the amounts. Hayward was superintendent of the railway company. Donald testified that the railway company had departments. The hotel company is reported as one department, except that it had a police department.

Paul Y. Waters testified for the defendant that he was secretary, treasurer, and general manager of the railway company and hotel company. J. E. Donald was superintendent of the resort and of the hotel company. He collected all dues from the holders of concessions for amusements. He produced a report of Donald's for August 17, 1908, to him as general manager of the hotel company, showing receipts from such parties amounting to $1,595.01. The scenic railway was constructed by Griffith Brothers, who operated it for a time. The hotel company operated it from 1906 to and during August, 1908; the railway company had nothing to do with it. Money was paid to Donald for the pay rolls by checks of the railway company. All moneys were collected from the hotel company and the railway company, and deposited to the account of the latter in the Riggs Bank, "for convenience." Checked out moneys to Donald from that account, and when insufficient to meet the demands for the hotel company, we borrowed it from Mr. Moffatt. These moneys were paid by the railway company and charged to Moffatt. The funds received from both companies are in the same bank account, but the accounts of each are kept separate in witness's office. The railway company has nothing to do with the receipts of the hotel company, except that they are deposited in one account for witness's convenience, instead of keeping two bank books. Each company operates at a loss and has never paid dividends. Mr. Moffatt advances money to keep it a going concern. He is mainly interested and a "deep creditor," and lends the money to make up the deficit. The receipts of the hotel company were credited to Mr. Moffatt. He receives the promissory note of the railway company to cover his unpaid advances. The railway

company gives notes to cover the shortage of both companies. The hotel company gives no note. Its account is charged to it. This has been going on since 1905. Moffatt owns the hotel company and the land on which the scenic railway is operated. The hotel company operates it under some verbal agreement with Moffatt. It is run as an adjunct to, one of the features of, the resort. Cross-examined, the witness identified a book produced as the cash book of the railway company. It does not show any receipts under the name of the hotel company. It shows cash advanced by Moffatt, the amount collected by the hotel company. Moffatt is credited for cash advanced $3,921.22; cash advanced to the railway company. It was carried under the name of Moffatt, because of the law relating to the Interstate Commerce Commission. The expenditures for the hotel company are charged in Moffatt's book. At the conclusion of the evidence, the plaintiff, being called upon to do so, elected to stand upon the first, second, and fourth counts of the declaration. Upon the conclusion of the testimony, defendants moved the court to instruct the jury to render a verdict for defendants, because of the insufficiency of the evidence to show negligence. The railway company asked that a verdict be returned for it, because the evidence did not show that it was liable for the operation of the scenic railway. Both requests were denied, and verdict was returned for the plaintiff. The defendants have both appealed.

*Mr. Frederic D. McKenney, Mr. John S. Flannery,* and *Mr. William Hitz* for the appellants.

*Mr. Leon Tobriner* and *Mr. Alvin L. Newmyer* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The fundamental questions presented by the record arise on

assignments of error relating to exceptions taken to the refusal of the court to direct a verdict for the defendants.

1. Assuming, for the time being, that both defendant corporations are responsible for the operation of the cars on the scenic railway, the first question is whether there was sufficient evidence to warrant the submission of the issue of negligence to the jury. "The provinces of the court and jury in the Federal judiciary system are separate and distinct, and the line of division between them must be carefully observed. The ascertainment of this boundary is often a matter of difficulty in a particular case, and when the difficulty arises doubts should be resolved in favor of trial by jury, which is the constitutional right of every suitor in the courts of common law. . . . And the court is never justified in directing a verdict, except in cases where, conceding the credibility of the witnesses, and giving full effect to every legitimate inference that may be deduced from their testimony, it is nevertheless plain that the party has not made out a case sufficient in law to entitle him to a verdict and judgment thereon." *Adams* v. *Washington & G. R. Co.* 9 App. D. C. 26–30, and cases cited. In other words it is only where all reasonable men can draw but one inference from the facts that the question is one of law for the court. *Jennings* v. *Philadelphia, B. & W. R. Co.* 29 App. D. C. 219–235, 10 Ann. Cas. 761; *Marande* v. *Texas & P. R. Co.* 184 U. S. 173–191, 46 L. ed. 487–495, 22 Sup. Ct. Rep. 340.

Applying these principles to the evidence, we are of the opinion that the court did not err in submitting the issue to the jury. The death of the plaintiff's intestate may be accounted for by two inferences from all of the facts given in evidence. One is that, by unnecessary exposure, his head came in contact with a post some 18 inches from the side of the car; the other that he was struck by some piece of the superstructure falling therefrom, which knocked him down and caused his head to come in contact with the post. Whether it inflicted a mortal wound, or only knocked him over so that his head struck the post, is immaterial. As recited in the statement, two witnesses saw a flash of some falling object. Both

dodged it. Immediately was heard the cry of the little girl, "My papa is killed." As the car track was under a roof, the falling object must have come from the superstructure, which was an essential part of the construction. Other testimony showed that the deceased was sitting firmly in his seat with his right arm extended back of his child and the hand holding the handle on that side. The witness who saw him looking out said that he turned his head, but not his body. The stenographic report notes that he indicated the position, but there is no description of his motion. The witness also said that deceased struck two posts. His body was limp, and the second post pulled it from the car. Another witness in the rear car did not see deceased strike but one post. He had lurched forward and fallen down in the foot space of the car; had practically fallen out of the seat. Was perfectly helpless and had no use of himself. His attention was arrested by a cry and when he looked up deceased was part of the way out of the car. These witnesses did not see the falling object, and may naturally have supposed that deceased was struck only by the post. The supposition that two posts were struck is inconsistent with the statement of other witnesses. But one post was found to have blood upon it. Witness was sitting firmly in his seat and holding to the handle on the right side. There was no lurch of the car to throw him from his balance. A witness for defendant said deceased dropped down in his seat, dropped a little more, and was then struck by the post. All were attracted by the cry of the little girl, which immediately followed the dodging of the falling object by the two witnesses in front. It was after this cry that deceased dropped down between the seats, his limp body protruding from the car. This protrusion may have been what was seen by the distant witness who saw him turn around and look down towards the grounds. There was no one beneath to look for, as the car was over the water of the bay. The structure was promptly closed by the management and no one was allowed to inspect it.

It was the province of the jury to reconcile any conflict in

the evidence, and to draw the proper conclusion from all the facts and circumstances.

Their conclusion was that some part of the overhead structure—a piece of beam, or a bolt, or whatever else it might be —was loosened, and falling struck the deceased, causing him to fall from his seat and protrude his body far enough to strike the post which crushed his skull and dragged him from the car.

The learned trial justice approved the verdict, and we agree with him that the conclusion was not unreasonable.

Defendants did not move for a directed verdict until they had produced their evidence in opposition. Strange to say, they did not produce the gripman, who was in a better position than any passenger on the cars to see what caused the injury, although they had him in attendance upon the court. Moreover, while the structure was closed so that the public could not inspect its condition at the place of the accident, no evidence was produced to show that defendants had inspected it so as to ascertain if anything was out of order. Nor was there evidence produced to show that the structure had been inspected prior to the accident, and found safe and in good repair. Producing weaker evidence when stronger might have been produced lays the defendants open to the presumption or suspicion that the stronger evidence would have been to their prejudice. *The New York,* 175 U. S. 187–204, 44 L. ed. 126–133, 20 Sup. Ct. Rep. 67; *Runkle* v. *Burnham,* 153 U. S. 216–224, 38 L. ed. 694–697, 14 Sup. Ct. Rep. 837; *Graves* v. *United States,* 150 U. S. 118–121, 37 L. ed. 1021–1023, 14 Sup. Ct. Rep. 40. In the case last cited, it was said: "The rule, even in criminal cases, is that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable."

This brings us to the consideration of some of the exceptions taken to the charge of the court in submitting the issue to the jury. The only one important to discuss is the 3d spe-

cial instruction given at the request of the plaintiff, as follows: "If the jury find from the evidence that Coleman Brez at the time of his death was a passenger for hire on said scenic railway, and that part of said structure fell, causing him to be struck and killed by coming in contact with some part of said scenic railway, then the jury are instructed that the fact of such falling of such scenic railway, in the manner aforesaid, raises a presumption of negligence in the operation of said railway, and their verdict should be for the plaintiff, unless they should further find that such presumption is overcome by a fair preponderance of evidence showing that said defendants were not guilty of ngeligence in the conduct or maintenance of said railway."

This instruction correctly applies the law to the issue presented by the evidence, and is expressly limited thereto. The case of *Weaver* v. *Baltimore & O. R. Co.* 3 App. D. C. 436, upon which defendants rely, involves a different state of facts. No injury occurred to the means of transportation. The party voluntarily protruded his head from the door of the car and came in contact with a bridge timber. But it was declared to be the law in that case that when an injury occurs through some accident to the means of transportation, which is under the management of the carrier's employees, and which, if they exercise proper care, could not ordinarily happen, it affords reasonable evidence, in the absence of explanation, from which the negligence may be inferred. This principle was not applicable to the facts of that case. A similar instruction to this was sustained in a recent decision of the Supreme Court of the United States in an action for damages for injury resulting from a high current of electricity that was carried into plaintiff's house, through contact of the primary wire with the secondary wire, intended to carry a low voltage for lighting the house. It was said by the court that "These circumstances pointed so persuasively to negligence on its part that it was not too much to call upon it for an explanation. Of course, if the cause of the injury was one which it could not have been foreseen and guarded against, it was not culpable, but,

in the absence of that or some other explanation, there was enough to justify the jury in finding it culpable. This was all that was meant by the instruction, reasonably interpreted. * * * When so read it rightly declared and applied the doctrine of res ipsa loquitur, which is, when a thing which causes injury without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care,—it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care." San Juan Light & Transit Co. v. Requena, 224 U. S. 89, 56 L. ed. 680, 32 Sup. Ct. Rep. 399. See also Kohner v. Capital Traction Co. 22 App. D. C. 181–186, 62 L.R.A. 875.

2. The second question raised by the assignments of error relates to the separate liability of the Chesapeake Beach Railway Company for the operation of the scenic railway. The court refused an instruction asked by said railway company to the effect that there was no sufficient evidence to show that the railway company erected, operated, or maintained the scenic railway at the time of the accident. The issue was submitted to the jury upon instructions asked by the plaintiff. The first was to the effect that if the jury believed from the evidence that the railway company operated Chesapeake Beach as a pleasure resort, in connection with its railway; that the hotel company was under the control of, and operated by, the railway company as one of its departments in the maintenance of Chesapeake Beach; and that the hotel company as the agent of the railway company operated the scenic railway,—the verdict should be against both defendants, if found guilty of negligence. The second instruction was to the effect that if the jury found from the evidence that the railway company apparently or nominally controlled the amusement resort and the scenic railway; that it paid the salaries of the employees of the hotel company, and the employees who conducted said scenic railway and policed said resort; that it hired and paid the musicians employed in the dancing pavilion; that it adver-

tised the place as a public amusement and pleasure resort, paid for said advertisements, and operated the hotel company as one of its departments in the conduct and operation of the said resort,—their verdict should be against both defendants. The liability of the railway company is not that of a lessor for a substantial defect in a structure let to a lessee for operation, as in certain cases cited on the argument: *Thompson* v. *Lowell, L. & H. Street R. Co.* 170 Mass. 577, 40 L.R.A. 345, 64 Am. St. Rep. 323, 49 N. E. 913; *Barrett* v. *Lake Ontario Beach Improv. Co.* 174 N. Y. 310, 61 L.R.A. 829, 66 N. E. 968; *Riley* v. *Simpson,* 83 Cal. 217, 7 L.R.A. 622, 23 Pac. 293. Nor is it governed by another class of cases: *Pennsylvania R. Co.* v. *Jones,* 155 U. S. 333, 39 L. ed. 176, 15 Sup. Ct. Rep. 136; *Chesapeake & O. R. Co.* v. *Howard,* 178 U. S. 153–166, 44 L. ed. 1015–1020, 20 Sup. Ct. Rep. 880. The facts of the last-cited case are in some respects analogous, but not to such an extent as to make it govern this. Reasoning from general well-known principles applicable to torts committed by corporations, which govern liability for the acts of their employees and agents, we are of the opinion that the court did not err in refusing to direct a verdict for the defendant railway company, and that the instructions given correctly instructed the jury as to the law applicable to the facts and circumstances in evidence.

Mr. Moffatt, a Denver banker, was the originator of the Chesapeake Beach enterprise, and furnished the money for its exploitation. He was the owner of the land on which the various places of amusement were situated. He first organized the Chesapeake Beach Railway Corporation with a capital stock of $1,000,000, to build and operate the railway between the city of Washington and the beach resort. Of this stock he was the owner of 83 per cent. The scenic railway, board walk, pavilion, and other adjacent places of amusement and dissipation, were built later; by whom or at what cost does not appear. The chief business of the railway company was carrying passengers who might be attracted by the amusements offered. It advertised these amusements regularly in the Washington newspapers, and paid for them. It hired and paid the band that

played daily in the pavilion. Later, Mr. Moffatt organized the hotel corporation with a capital stock of which he owned all but the ten shares necessary to qualify the directors. The officers of the railway company occupied corresponding positions in the hotel company. It is apparent that the capital stock of the hotel company, if fully paid, would not be sufficient to pay for the improvements before mentioned; and it would not be unreasonable to infer from the evidence as to other payments that these were paid for by drafts on the treasury of the railway company. The charters of the corporation, obtained in Maryland, do not appear in the record, and the scope of their powers do not therefore appear. It is immaterial whether the railway corporation was empowered to maintain the several amusement places, as it would not be relieved from liability for torts committed while acting *ultra vires.* The evidence tends to show that the principal office of the railway company was occupied by the same officers, as officers of the hotel company. All officers and employees, whether engaged in the train, hotel, or amusement service, were paid by checks of the manager of the railway company upon its bank account. The pay rolls produced in evidence for the month of August, 1908, are made out on blanks of the railway company and bear the approval of its general officers. The blanks on their face represented three different departments, namely, "Machinery," "Police," and "Hotel." The gripman on the scenic railway appears on each roll as car cleaner, watchman, and gripman. The superintendent of the resort, as he subscribed himself, acted in that capacity during the summer months, and as agent and telegraph operator for the railway company during the remainder of the year. In the name of superintendent of the hotel company he collected the revenues from the holders of concessions, and the receipts of the scenic railway from the ticket sellers. All receipts from these sources and from the hotel were paid to the managing officer of the railway company and deposited to its credit in a Washington bank. No other bank account was kept. All these receipts were entered on the cash book of the railway company. No other books were kept save

such as showed transactions with Mr. Moffatt. The entire business was run at a loss. From time to time Moffatt advanced the necessary sums to meet the deficit. It was testified that the account kept with him showed the debits and credits of each corporation. But each advance to cover the general deficit was met with the promissory note of the railway company alone. No obligation was ever given by the hotel company. This action of the controlling spirit and directing hand of the entire enterprise, as well as the limited capital stock and want of tangible property, by the hotel company, indicate that he regarded the railway company as the responsible party, for all the purposes of his original enterprise. It is possible that, in anticipation of such a situation as this, he put the scenic railway under the ostensible management of the hotel company, as a separate concern. This manner of operation is not an unusual one. Be this as it may, however, the facts and circumstances in evidence were sufficient, in our opinion, to warrant the submission to the jury of the issue whether the hotel company was but a department of the railway company, and its agent for the operation of the scenic railway as a feature of the resort. Some other points have been made under the assignments of error, but those discussed serve to dispose of the case.

The judgment against each defendant will be affirmed with costs.                                  *Affirmed.*

Mr. Justice VAN ORSDEL, dissenting:

This judgment is not based upon either fact, law or justice. My associates, in a studious and skilful attempt to sustain the judgment below, have totally failed to advance any reason or theory that will support the right of recovery under the first count of the declaration. The first count charges defendants with negligence, in that certain wooden posts or uprights erected along the tracks at the point where the accident occurred were not a reasonably safe distance from the tracks; that they were unguarded, and that the deceased, by reason of the negligent

manner in which the car was operated, was "violently and with great force, jerked, jolted, and thrown toward and against one of said uprights or posts," and killed.

It appears that the train consisted of two open cars, in each of which were four seats. The deceased, with his daughter, occupied the rear seat of the front car. The two seats in front of them were each occupied by a lady and gentleman. No one was riding in the front seat. The rear car was occupied by passengers, and the motorman in charge of the train occupied a position on the rear of the front car immediately behind the deceased and his daughter.

It was conceded at bar that if deceased came to his death as the result of his head coming in contact with the upright posts, there could be no recovery. Every witness who saw the accident, and testified concerning it, all but one of whom were seated in the car immediately behind where the deceased was seated, testified that deceased was killed by coming in contact with the uprights which supported the roof of the structure; and those who saw all that occurred testified that he was killed by his head striking one of the posts, knocking him backward and downward in his seat, when he fell out against a second post which dragged him from the car. The evidence totally fails to establish negligence on the part of defendants under the first count. All the witnesses who were on or about the train at the time of the accident testified that it was moving at the usual rate of speed, with no jerking or anything unusual in its motion. The posts stood $13\frac{1}{2}$ inches from the ends of the car seats, which were 38 inches wide, furnishing ample space for two passengers. There was no evidence to show negligence in the location of the posts with reference to the cars, and no negligence in that respect can be inferred. It was also shown that fifty or sixty thousand passengers had been hauled annually on this railway without any accident having occurred before the one under consideration. If the deceased came to his death as the result of his head coming in contact with one of the posts while carelessly leaning out from the end of the seat, as described by the witnesses who saw what actually hap-

pened, he was clearly guilty of such contributory negligence as would forbid recovery. *Weaver* v. *Baltimore & O. R. Co.* 3 App. D. C. 436.

The failure to establish negligence on the part of defendants under the first count of the declaration being conceded, the court in its opinion attempts to sustain the judgment upon the evidence adduced in support of the charge of negligence contained in the second count, wherein it is charged, in effect, that the accident was occasioned by the defective condition of the roof or covering over the tracks at the point where the accident occurred, in that a cross beam or other object fell from its fastenings and struck the deceased, killing him.

In this branch of the case the theory that deceased came to his death from his head striking the post is totally abandoned. The two theories are inconsistent. The judgment must rest on one or the other, not both, and since no liability was established under the first count, I will consider briefly the evidence in support of the second. Plaintiff relies entirely upon the testimony of the two men occupying the seats in front of the seat occupied by the deceased. The first witness testified in chief as follows: "There was a flash of some kind. I don't know what it was; but it appeared to be something falling. I dodged it. I dodged down between the seats like, and then I heard the little girl holloa, 'My papa is killed.' Now, what this was falling, or anything like that, I can't say positively; but there was something there that made me dodge, and it had the appearance and color of a piece of the superstructure at that time, which I think was a light pea green. I am not really positive about that, but anyhow it fell there kind of cater-cornered across the left of the car, and it made me go that way (indicating), dodging. * * * There was some flash across the tracks like this (indicating), and that is why I dodged. I didn't know what it was."

On cross-examination this witness testified as follows:

"Q. Do you recall whether you were talking to Mr. Kronheim when you saw something flash by you?

A. No, sir; not at that time. I am positive there was no conversation between us.

Q. Did you see this object, whatever it was, that flashed?

A. I couldn't tell you; but it was a flash or something. You could almost hear the swish through the air from it. I don't know what it was. I know I dodged it to save myself, and immediately I dodged it, and I heard the little girl holloa.

Q. Did you hear anything strike?

A. No, sir.

Q. Did you hear anything around there crack, just before the object fell, whatever it was?

A. No, sir.

Q. What makes you think that this object was pea green?

A. Well, it was my impression at that time from the structure being painted that color.

Q. Your testimony, then, that this object was pea green, is based upon the assumption that the structure was pea green. Is that right?

A. Yes, sir.

Q. And you did not see the object?

A. No, sir; I don't know what it was.

The other witness testified in chief as follows: "As we got there, there was a flash came across like that, and I kind of moved, and, of course, after that, I heard the little girl holloa, 'My father is killed.' Of course, I don't remember anything after that. Of course, I don't say that anything struck him, or anything like that. I don't know that."

On cross-examination this witness testified:

Q. You say you noticed a flash of some kind?

A. Yes, sir. I noticed a flash.

Q. You don't know whether it was something that was big or small?

A. I don't know.

Q. Do you know anything about the color of it?

A. I don't know anything about the color of it.

Q. Before you heard the flash did you hear any cracking or breaking of anything?

A. No, I can't say I did.

Q. After you heard the flash, or at the same time you heard the flash, did you hear any object strike anything around there?

A. I can't say I did.

This is all the testimony relied upon to support the charge of negligence in the second count of the declaration.

It is held by the court that this evidence established the fact that something in the structure was jarred loose, fell down, and struck the deceased, causing his death. Nothing was found in or about the car. The witnesses heard nothing breaking loose from the structure, saw nothing in the air that they could describe, and heard nothing strike. The witnesses in the rear car who actually witnessed the accident, and were in a position to observe what actually happened, saw no pea-green flash, and no object fall from the structure and hit the deceased. A witness who was standing on the beach under the car at the time of the accident testified that he was looking up and saw the deceased leaning out over the end of the seat, and saw his head strike one of the posts, and that nothing fell through upon the beach or into the water.

This branch of the case resolves itself into the sufficiency of the evidence relating to the flash to support the judgment. The court, in its opinion, is forced to draw the inference from this evidence, that a part of the structure jarred loose from overhead, fell down, and struck the deceased. The difficulty with this theory is that there is no legally established fact upon which the inference can be based. No part of the structure was shown to have been jarred loose; nor was there anything found to indicate it. Neither is there any evidence that the deceased was struck by an object falling from the structure. Hence, the jury was left to infer from this mysterious flash, first, that something was jarred loose from the structure; second, that this something caused the flash, and, third, that it hit and killed the deceased. This is not only piling one inference upon another, but no legal fact has been established upon which to base any of the inferences. It follows that this evidence is not sufficient to support the verdict. *Weaver* v. *Baltimore & O.*

*R. Co.* 3 App. D. C. 436; *Manning* v. *John Hancock Mut. L. Ins. Co.* 100 U. S. 693, 25 L. ed. 761; *Looney* v. *Metropolitan R. Co.* 200 U. S. 480, 50 L. ed. 564, 26 Sup. Ct. Rep. 303.

This brings us to the chief error into which my associates have fallen. The court below gave the jury the following instruction, which was objected to and assigned as error: "If the jury find from the evidence that the said Colman Brez at the time of his death was a passenger for hire on said scenic railway, and that part of said structure fell, causing him to be struck and killed by coming in contact with some part of said scenic railway, then the jury are instructed that the fact of such falling of such scenic railway, in the manner aforesaid, raises a presumption of negligence in the operation of said railway, and their verdict should be for the plaintiff, unless they should further find that such presumption is overcome by a fair preponderance of evidence showing that said defendants were not guilty of negligence in the conduct or maintenance of said railway."

I am familiar with the cases in which this sort of an instruction is proper. The instruction, however, in this case, was misleading and erroneous, in that it assumed that plaintiff proved that a portion of the structure fell and killed the deceased, when no such proof existed. Before defendants could be called upon to answer the charge in the second count, plaintiff must have shown as an affirmative fact, not only that a part of the structure fell, but that it caused the injury to deceased. No such proof appears in the record. Defendants were not called upon to explain the vision of the pea-green flash until plaintiff had affirmatively shown that it originated from the structure, and that it was the proximate cause of the death of the deceased. Neither of these facts was established.

Much is attempted to be made of the fact that the place was closed after the accident occurred, and of the further fact that defendants failed to place the motorman upon the stand. The record is silent as to any request having been made by anyone to inspect the structure after the accident, and it was not incumbent upon defendants, under the facts disclosed, to invite

an inspection.  In fact, from the time that elapsed between the accident and the filing of the declaration, the suit was apparently an afterthought.  Defendants were not required to place the motorman upon the stand until an issue of fact had been tendered by the plaintiff that called for rebuttal, and no such issue was tendered in support of the charge in the second count.  Defendants rested upon their conclusive answer to the charge of negligence in the first count, which, owing to the failure of plaintiff's evidence to sustain the second, disposes of the case.

It is sought in the opinion to apply the doctrine of *res ipsa loquitur.*  Before that doctrine can be invoked some cause for the injury must be established.  The mere happening of an accident creates no presumption of negligence.  The cause of the accident must be affirmatively located before the rule can be invoked.  As was said in *Pennsylvania R. Co.* v. *MacKinney,* 124 Pa. 462, 2 L.R.A. 820, 10 Am. St. Rep. 601, 17 Atl. 14: "A passenger's leg is broken while on his passage in a railroad car.  This mere fact is no evidence of negligence on the part of the carrier until something further be shown.  If the witness who swears to the injury testifies also that it was caused by a crash in a collision with another train of cars belonging to the same carrier, the presumption of negligence immediately arises; not, however, from the fact that the leg was broken, but from the circumstances attending the fact."  In so far as the second count of the declaration is concerned, no relation has been established between the cause of the accident and the accident itself.  It is well settled in actions of this kind that to establish a prima facie case that will entitle recovery, plaintiff must not only show that he sustained injury, but that defendant has been guilty of some negligent act which produced the injury.  "The negligence alleged and the injury sued for must bear the relation of cause and effect.  The concurrence of both and the *nexus* between them must exist to constitute a cause of action.  As an injury may occur from causes other than the negligence of the party sued, it is obvious that before a liability on account of that injury can be fastened upon a

particular individual, it must be shown, or there must be evidence legally tending to show, that he is responsible for it; that is, that he has been guilty of the negligence that produced or occasioned the injury. In no instance can the bare fact that an injury has happened of itself, and divorced from all the surrounding circumstances, justify the inference that the injury was caused by negligence. * * * Until you know *what* did occasion an injury, you cannot say that the defendant was guilty of some negligence that produced that injury. There is therefore a difference between inferring as a conclusion of fact *what* it was that did the injury; and inferring from a known or proven act occasioning the injury, that there was negligence in the act that did produce the injury. To the first category the maxim *res ipsa loquitur* has no application; it is confined, when applicable at all, solely to the second." *Benedick* v. *Potts,* 88 Md. 52, 41 L.R.A. 478, 40 Atl. 1067.

Here there is no known or proven act of defendants which occasioned the accident. The two witnesses who occupied seats in front of the deceased were totally ignorant of what caused his death. The only fact certainly established in support of the allegations of the second count of the declaration is that deceased was killed in some way, and the jury were allowed, in the absence of any affirmative proof of the cause, to speculate, conjecture, and infer that some unknown act of negligence, for which defendants were responsible, caused the accident. No circumstance has been shown in this case upon which an inference of negligence can' be based, or that will bring it, within the doctrine of *res ipsa loquitur*.

In viewing the whole case, there is no room for reasonable minds to differ as to how this accident occurred. Deceased carelessly leaned out of the car and struck one of the posts which knocked him back into his seat, from which he fell against a second post and was dragged from the car. The evidence, intelligently and fairly analyzed, will not admit of any other conclusion or hypothesis.

Errors of law are apparent upon the face of the record, but, to reverse the judgment and order a new trial, in view of the

evidence as disclosed in the record, would be a perversion of justice. The motion for judgment in favor of defendants should have been granted.

A motion by the appellants for a rehearing was denied October 19, 1912.