## NEW YORK LIFE INS. CO. v. MILLER.
### No. 6448.

United States Court of Appeals for the District of Columbia.

Argued Nov. 6, 1935.

Decided Dec. 9, 1935.

R. A. Bogley, Frederic D. McKenney, John S. Flannery, and G. Bowdoin Craighill, all of Washington, D. C., for plaintiff in error.

Paul B. Cromelin, William A. Coombe, and Julian T. Cromelin, all of Washington, D. C., for defendant in error.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

ROBB, Associate Justice.

Writ of error to the municipal court where a judgment was entered for the plaintiff (defendant in error here) after a trial by the court, without a jury.

Suit was brought to recover on a life insurance policy issued by the defendant insurance company (plaintiff in error) on March 21, 1931, in the amount of $2,000, on the life of Edna T. Van Lear, born October 5, 1900, hereinafter called the insured. On July 20, 1931, the amount of the policy was reduced to $1,000. Defendant admitted that the policy was in force at the time of the insured's death on September 13, 1931, but denied liability except to the extent of the amount of premiums paid, basing its contention on the provision of the policy reading as follows: *"Self-Destruction.*—In event of self-destruction during the first two insurance years, whether the insured be sane or insane, the insurance under this policy shall be a sum equal to the premiums thereon which have been paid to and received by the company and no more."

After making proof of the death of the insured, plaintiff rested.

Defendant then offered in evidence the coroner's certificate of death, in which it was stated that the insured died September 13, 1931, and that the cause of death was "Lysol poison. Suicide." The question on the form of the certificate, "Was there an autopsy?" was not answered by the coroner, evidently because it would have been in the negative.

Plaintiff objected to the introduction in evidence of that portion of the certificate which gave as the cause of death "Suicide," and tendered proof that the coroner or deputy coroner, on whose certificate the certificate of death issued by the health department was based, did not see the remains of the deceased until 10 o'clock on the morning following her death; that there was no physician in attendance upon the deceased at the time of her death; and that the certificate of the health department was hearsay upon hearsay, but the court received the certificate in evidence.

Defendant contended that it constituted prima facie proof that the insured had committed suicide and that, therefore, the burden again shifted "to the plaintiff to overcome that prima facie showing of the certificate." Counsel for defendant stated to the court: "Of course, it goes to the order of proof, which is strictly in the discretion of your honor. Perhaps you think we should continue with our proof of suicide, which we are prepared to do; but I would naturally prefer Mr. Cromelin (of counsel for plaintiff) to put on his case before I put on mine. I make the point, and I think it is a proper one." The court announced: "I have simply let it (the certificate) in as part of the evidence in support of the plea of the defendant company, and, therefore, I am of the opinion that the defendant should go forward

with its testimony." Defendant reserved an exception to the ruling.

Thereupon the defendant introduced evidence which is substantially as follows: The insured for several years prior to her death was employed in the Finance Office of the War Department. Her immediate superior testified that within the last few months of insured's life, and after insured's operation (which was several months before she died), insured was a little bit nervous, but aside from that witness saw no change in insured's condition, mentally or physically; "that she was just as good a clerk." Sometimes insured would be intoxicated, so intoxicated that it would be necessary to send her home. On cross-examination witness stated that insured's salary was $1,620 per annum; that for a period of approximately two months prior to her death insured "had become more addicted to the use of intoxicating liquor; * * * that on Saturday, September 12, 1931, the insured worked until 1 o'clock; that when she left the office on that day she was perfectly all right; that she was not under the influence of liquor, and that she seemed very cheerful and like herself; * * * that insured then told witness that she was going home to iron that afternoon." Another employee in the same division of the War Department testified to the same effect.

Dr. Thibadeau assisted on May 10, 1931, in an operation on insured and attended her while she was in the hospital, from which she was discharged as recovered on June 26, 1931. The doctor next saw insured on July 18th at his office, and treated her for quinsy sore throat. He testified that he advised her to have her tonsils removed; that "the next time he saw her was on the evening of September 12, 1931, between 5:30 and 8 o'clock, and this was the last time he saw her; that Mrs. Van Lear came to ask him on that day if there was any hurry about having her tonsils out and how long it would be safe to wait; that she explained she had been through quite a lot of surgery and had lost quite a lot of time from her work, and it had cost her quite a lot of money, and she wanted to know if it would be all right to wait for a while, and he told her 'yes, that it was not an emergency at all, but that she should have her tonsils out at her earliest convenience, due to the infec-

tion she had had prior to that time.'" That insured had gotten over her abdominal operation very well; that her physical condition was fairly good. There was nothing that insured said or did or that witness said to insured "that would cause insured, in the opinion of witness, to commit suicide." Witness testified as to the effect of Lysol taken internally. That a dram or a teaspoonful might cause death; that an ounce could cause death immediately; that "if as much as two ounces were taken, it would kill in almost every instance if there were no immediate treatment; * * * that the person who takes it goes into a complete state of collapse; that following the stupor the patient goes into a coma; that there possibly are cases where even on small quantities taken the coma may ensue in ten seconds after it is taken. * * *"

Dr. Israel Baker, proprietor of a drug store, produced the "Poison Register" of his store, and testified that the register of September 12, 1931, contained the following entry:

phone
"9.12, Mrs. Van Lear, ∧ 5121 Kan. Ave., 3 oz. Lysol (ditto marks appearing immediately below the word 'disinfectant' in the line above) Tayloe."

That the entry was in Dr. Tayloe's handwriting; that Dr. Tayloe, relief druggist, was on duty on September 12, 1931, from 12 o'clock until 6 o'clock in the afternoon. The last entry preceding the one in question was also for Lysol.

Dr. Tayloe testified that the entire entry of the sale listed to Mrs. Van Lear was in his handwriting, with the possible exception of the word "phone"; that he could not identify the voice that came over the telephone; that he remembers that the person placing the order also ordered some ice cream; that the person who placed the order "gave 5121 Kansas Avenue as the address; that he is equally certain about all of the entries, and there can be no mistake about them; that he does not know when the word 'phone' was written in there, and is not sure that it is in his own handwriting, and does not know who put it there; that it may have been written in three days after September 12, when an inspector called; * * * that he did not make a mistake in taking the address 5121 Kansas Avenue NW., over the telephone." (Insured's correct address was No. 5124

Kansas avenue.) That there is nothing on the book to indicate how long the sale ahead of the Van Lear sale took place.

A colored messenger employed by the drug store testified to taking "a package of Lysol and ice cream" and delivering it to a woman about 28 or 30 years of age at a house in the 5100 block of Kansas avenue.

Dr. Arnold testified that about 3 o'clock in the morning of September 13th he was taken to 5124 Kansas avenue by a policeman, where he found the person whom he later learned was Mrs. Van Lear, the insured, lying in bed, and he examined her and pronounced her dead. Her face was flushed and he noticed a burn on her lip and chin. He also noticed "a great odor of Lysol about the body."

Several members of the police force, who went to 5124 Kansas avenue between 1 and 2 o'clock in the morning of September 13th, testified to finding a small bottle of Lysol in the bathroom adjoining the room in which was the body of the insured; "that there was as much as an inch from the bottom of the liquid still in the bottle." One of the officers testified that when he saw the bottle "it was half empty."

Thereupon defendant announced its evidence closed. Counsel for plaintiff then moved the court for a finding of fact in favor of the plaintiff. After argument the court overruled the motion.

The plaintiff introduced rebuttal testimony. Charles B. Miller, a supervisor for the C. & P. Telephone Company, husband of Frances Miller, plaintiff, and brother-in-law of the deceased, testified that from May, 1931, to September, 1931, witness' wife, daughter, sister-in-law (insured), and himself were residents of his home at 5124 Kansas avenue. On the afternoon of September 12, 1931, he first saw his sister-in-law about 1:30 p. m. She was in a normal state of mind; "that she was right cheerful and pleasant." That he and his wife went to the country that day, and left their daughter in the care of insured. That insured said she had planned to do some ironing and washing in the afternoon and "to go to the ball game with her husband the following day." This conversation was about 1:30 o'clock. Witness did not see his sister-in-law again until at 10 o'clock on Sunday morning, the 13th. That the coroner did not come there until 10 o'clock Sun-

day morning. Witness identified a pint bottle shown by plaintiff's counsel to various witnesses for the defendant and which contained a small quantity of white liquid having the odor of synthetic gin. This bottle was found in the bedroom where the body was directly after the coroner left. That the Van Lears were married about 8 years prior to insured's death, but had not lived together for several years, although Mr. Van Lear "came to the house to deliver fish which witness purchased; that some of these were visits to Mrs. Van Lear and some were not." (Mr. Van Lear died about a month after insured.)

Leroy T. Gravatte, Jr., who married Frances Miller (daughter of preceding witness), testified that he went to the Miller home about 7:30 p. m. on Saturday, September 12th, and shortly thereafter insured came down the stairs and sat at the bottom of the steps, and witness and Miss Miller left the house about 8 p. m. and returned about 11:30 or 12 o'clock. When they returned the "insured called downstairs and told them there was some ice cream in the refrigerator, and when they asked if they should bring a dish up to her she told them that she had already had some and that she did not want any more—for them to just go ahead and eat the rest." Possibly half an hour later they heard the water turned on in the basin in the bathroom. Frances went upstairs to see what the reason was for the water being left on; came back and called witness, who went upstairs and saw Mrs. Van Lear "lying on the bed"; "lying on her back and was partly on the bed." "In other words, she had fallen." That witness "put her up—full length on the bed." Witness thought she was intoxicated.

Frances Miller Gravatte (wife of the last-mentioned witness) testified that she and her aunt, the insured, went down cellar and ironed until about 4 o'clock on the afternoon of September 12th, 1931 (witness then was about 18 years old); that insured was chaperoning witness. Her aunt told her that "she was going to the ball game the next day with her husband, and she might go to church in the morning (Sunday), and she was pressing her dresses for that cause." "Insured seemed to be gay and very lively; in fact, they were very friendly." They had had dinner together in the middle of the day. That witness and Mr. Gravatte went out for a ride and got back about 11 p. m.,

when insured called down that there was ice cream in the Frigidaire; "that when insured called to witness and her husband on their return and told them that there was some ice cream there, the only thing unusual that witness noticed about the conversation was that her aunt had been drinking; that witness could tell when her aunt drank—by the way she used to speak her name—that she used to get it all backwards." That her aunt had taken some ice cream out of the package and it was quite milky when they got it. About half an hour later witness heard the spigot running in the bathroom and heard her aunt stumble from the bathroom to the bedroom. Witness then went upstairs, turned off the spigot, and went into her aunt's room and turned on the light. Witness asked her aunt what was wrong with her; her aunt "tried to talk, but she had no speech." "That witness knew at that time that insured had been drinking some." "That it was not unusual to see insured in this state; that she had seen insured drunk before." "That witness got a cold cloth and put it on her head."

After testifying as to the position in which the insured was lying across the bed, witness testified that her aunt used Listerine very much; that she used it before going to bed, and always before going out. That there had been a bottle of Listerine, also a bottle of Cascara in the house; "that the Listerine bottle and Cascara bottle are about the same as the Lysol bottle." Thereupon witness identified a Listerine bottle and Cascara bottle, shown her by counsel for the plaintiff, which were about the same size and shape as the Lysol bottle theretofore introduced in evidence. Witness further testified that those bottles were kept in the medicine cabinet; "that witness and insured both used Cascara as a cathartic and kept it in the house together; that the Listerine bottle, the Lysol bottle, and the Cascara bottle were kept in the same medicine cabinet; that there was another bottle of Lysol in the house that same night; that there was a bottle of Lysol in the bathroom; that there was a pint bottle of Lysol kept in the linen closet; that the pint bottle of Lysol, kept in the linen closet, had been there at the house for months and months; that insured knew that this pint bottle of Lysol was there; that witness had seen insured take the pint bottle of Lysol to her room and put it back there in the closet; that witness had seen insured take it and put it back for a period of about three weeks prior to this night." That the coroner did not get to the house until around 10 o'clock the next day.

After argument by counsel for the respective parties, the judge announced his finding in favor of the plaintiff, and in the course of his oral opinion he said: "To say that the decedent came to her death by a purpose of her own would be, to my mind, the rankest speculation."

The case having been tried without a jury, the findings of fact of the court, if based upon substantial evidence, have the force and effect of a jury verdict. Fries, Beall & Sharp Co. v. Livingstone, 56 App.D.C. 209, 12 F.(2d) 150; Goode v. United States, 44 App.D.C. 162, 166; United States v. U. S. Fidelity & Guaranty Co., 236 U.S. 512, 527, 35 S.Ct. 298, 59 L.Ed. 696; U. S. v. Jefferson Electric Mfg. Co., 291 U.S. 386, 54 S.Ct. 443, 78 L.Ed. 859.

In the case last cited, suits tried to the court under a stipulation in writing waiving a jury were among those involved. The court said (291 U.S. 386, 407, 54 S.Ct. 443, 450): "Whether the District Court erred in denying the defendant's motion at the conclusion of the evidence for judgments thereon in his favor must be determined by ascertaining whether there was substantial evidence fairly tending to establish every element of the plaintiff's causes of action. We think there was such evidence. There was conflict in it; parts of it admitted of diverging inferences; and as to some matters the preponderating weight was difficult of ascertainment. But these were all matters for the trial court to determine. It was exercising the functions of a jury and its findings are on the same plane as if embodied in a jury's special verdict. We are accordingly of opinion that the motion was rightfully overruled, and that the Circuit Court of Appeals erred in not so holding. Even if there was some basis for thinking the weight of the evidence was with the defendant, as was strongly urged at our bar, it was not within the province of that court to re-examine the evidence and reverse the judgments because of what it regarded as error of fact."

In the first of the two assignments of error it is asserted that the court below erred "in ruling that the death cer-

tificate did not constitute prima facie proof of the cause of the insured's death." Under the facts of this case, that part of the certificate giving the cause of death as "suicide" (the only part to which plaintiff objected) was not admissible for any purpose. Levy v. Vaughan, 42 App.D.C. 146. In that case the facts regarding the certificate were identical with this case. The court (through Mr. Chief Justice Shepard) said: "The coroner was not in attendance upon the patient. He did not make the autopsy, and his information regarding the cause of death was hearsay. * * * The coroner was an available witness and might have been called to testify to any actual conditions observed by him. As a matter of fact, he had no direct knowledge of the facts, but certified upon information derived from others."

Labofish v. Berman, 60 App.D.C. 397, 55 F.(2d) 1022, is not inconsistent with the rule announced in the Levy Case, for in the Labofish Case the statement in the certificate as to the cause of death was not made upon hearsay evidence but (as disclosed by the record) by the attending physician; the opinion being directed to the ordinances requiring the "attending physician" to furnish the registrar of vital statistics a certificate setting forth the "cause" of death.

The next assignment of error challenges the conclusion of the court that the defendant had not sustained the burden of proving that the insured committed suicide.

It is settled law that a suicide clause in a policy of insurance must be given effect according to the terms of the contract (Bigelow v. Berkshire Life Ins. Co., 93 U.S. 284, 23 L.Ed. 918), but, being an affirmative defense, the burden of proof is upon the insurance company, and the evidence on this point must outweigh the evidence of the plaintiff. Home Benefit Association v. Sargent, 142 U.S. 691, 12 S.Ct. 332, 35 L.Ed. 1160. To warrant the reversal of a judgment for the plaintiff in such a case, the proof must be "so certain and conclusive that all reasonable men must necessarily infer therefrom that the death was the result of design instead of accident." National Union v. Thomas, 10 App.D.C. 277, 290.

In our view, the evidence in this case on the suicide issue does not meet the above-stated rule. Insured was a young woman, about 31 years old, holding a reasonably permanent clerical position at a good salary. She was not living alone, but resided with her sister's family; and although insured had not lived with her husband for four years prior to her death, her husband visited her, and she had planned to go to a ball game with him the day she died. She had visited her physician a few hours before her death and, because of her previous medical expense, inquired whether there was any urgency about the removal of her tonsils and was assured that it would be all right to wait for a while; in other words, her tonsils were not then seriously affecting her health. That visit indicates that she was interested in her well-being, and it is inconceivable that she had suicide in mind at the time of her visit. Her attitude did not indicate to her physician a suicidal frame of mind. Her operation had not affected the caliber of her work or her mental condition, which it was testified was normal. When insured left her office about noon, she was cheerful and pleasant to her office associates; during the afternoon at home she was gay and lively with her niece, whom she was chaperoning while her niece's parents were away over the weekend; she spent the afternoon with her niece ironing and washing and pressing dresses in anticipation of going to church and attending the ball game the following day, Sunday, with her husband. Her niece went out with a young man about 7:30 p. m. and returned about 11 p. m., and at that time the insured called down from the second floor of their home and engaged in conversation with her niece and the young man concerning ice cream in the Frigidaire, and her niece believed from insured's speech that she was drunk. A pint bottle with a small quantity of liquid having the odor of synthetic gin was found in the bedroom where insured's body lay.

The testimony relative to the purchase and delivery of Lysol to insured is inconclusive. A small bottle containing a small amount of Lysol was found in the bathroom. A medicine cabinet in the bathroom had contained Listerine, Cascara, and Lysol, all in bottles of the same size as the Lysol bottle found in the bathroom. Insured had used Listerine very much, and also used Cascara as a cathartic, and knew of another bottle of Lysol in the linen closet.

Half an hour after the conversation regarding the ice cream, her niece went to insured's bedroom after hearing insured stumble from the bathroom, turned on the light, and spoke to insured, but insured did not answer, and her niece placed a cold cloth on the head of insured, from whose throat considerable sound emanated.

It is, we think, clear that there was substantial evidence to support the finding of the court below that defendant had not sustained the burden of proving suicide.

Judgment affirmed.

Affirmed.