**Betty Joe BOWMAN, Appellant,**

v.

**REDDING & CO., Inc., et al.**

**No. 23932.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 25, 1970.

Decided Feb. 16, 1971.

Petition for Rehearing Denied
June 2, 1971.

Mr. Fred Warren Bennett, Washington, D. C., with whom Messrs. Arthur G. Lambert and Walter S. Furlow, Jr., Washington, D. C., were on the brief, for appellant.

Mr. Hal Witt, Washington, D. C., with whom Mr. Leonard C. Greenebaum, Washington, D. C., was on the brief, for appellee Redding & Co., Inc.

Mr. William E. Stewart, Jr., Washington, D. C., with whom Messrs. Richard W. Galiher, William H. Clarke and Wade J. Gallagher, Washington, D. C., were on the brief, for appellee Anthony Izzo Co., Inc.

Before LEVENTHAL, ROBINSON, and WILKEY, Circuit Judges.

LEVENTHAL, Circuit Judge:

This is an appeal from a judgment of the District Court awarding a directed verdict to the defendants in a wrongful death action. Appellant Betty Joe Bowman is the administratrix of the estate of her husband, James L. Bowman, whose death was allegedly caused by the negligence of employees of appellees Redding and Company, Inc., and Izzo and Company, Inc.[1]

We reverse. There was proof showing that defendant Redding violated safety regulations designed to protect people in the class of plaintiff's decedent. In the light of this negligence and the facts of this case, we consider issues of proximate cause, contributory negligence, and "last clear chance" negligence (involving a claim of negligence of Izzo as well as Redding), and conclude this case should have gone to the jury. We further are of the view that the normal doctrine placing on plaintiff the burden of proof that defendant's negligence was the cause of his harm is subject to an exception where the jury concludes that the conduct of both defendants was tortious, but that plaintiff has not proved which of them caused the injury or death. In that situation, the applicable doctrine shifts to each defendant the burden of proving that he has not caused the harm.

## I. *The Facts*

James Bowman came to his death on the morning of March 9, 1964, at a building then being constructed at 1025 Vermont Avenue, N.W., Washington, D. C., by Redding and Co., general contractor. Decedent, an apprentice caulker[2] with eighteen months' experience, met Ernst Tonstad, employed as a foreman by the Vinge Company, at a nearby Washington site at 7:30 a. m. Mr. Tonstad told decedent to go to the twelfth (and top) floor of the building under construction. Mr. Tonstad planned to meet decedent there after a trip to the Vinge Shop in Alexandria, Virginia, to

---

1. No appeal was perfected as to the third defendant, Williams Enterprises, Inc.

2. A window caulker stands inside and applies caulking material around the perimeters of the window frames against the masonry, on the outside. It is thus an easier job to accomplish when no glass has been installed in the window.

pick up caulking materials necessary for the job. At that time, the windows on the first through eleventh floors had already been caulked, and the glass had been installed, without caulking, on the twelfth. The twelfth floor windows were locked and could not be opened without a key.

On the east side of the building, Redding and Co. had erected a hoist to carry supplies from the ground to the workmen above. An opening was left on each floor on the east side for access to the hoist, with ramps running from about eight feet back inside the building, up a slope to the opening, and then to within eight inches of the path of the hoist cage. The hoist cage ran up and down about three feet from the wall inside a shaft constructed for that purpose.[3]

Mr. Bowman was next seen by William Marginot, a sheet metal worker who was constructing a scaffold around the interior portion of the elevator ramp on the eleventh floor. The scaffold was built over the ramp so as to completely block the opening in the wall through which the ramp ran. There was a space of about one foot between the end of the scaffold and the interior wall, however, and Marginot observed Bowman squeeze between the scaffold and the wall to look out at the eleventh floor windows from the outside to observe the caulking that had been done there. Bowman then returned inside the building.

On this morning, the hoist was being operated by Robert L. Humphrey, an employee of Redding, from a shed on the ground. With his view of the upper floors blocked by the shed's ceiling, Humphrey depended on standardized bell signals given to him by the workers on

the building and on hand signals from workers in sight on the ground in order to know whether to raise or lower the hoist and how far to move it. Shortly before the accident, Leonard Williams, an employee of Anthony Izzo and Co., Inc., the masonry subcontractor, had loaded the hoist with bricks and mortar and had signalled Humphrey to raise it up to the roof, where other Izzo employees were working.

Subsequently, the roof workers rang the bell three times, which signalled Humphrey to bring the hoist down to the ground. At this point, Williams looked up:

> When I looked up, after he rang, the cage was coming down. I did not see nobody. I looked up and when it got to about the 11th floor, that is when I looked and saw this man, like he were hanging. I could not see nothing but his feet. It scared me so bad I just came hollering, "Hold it. Hold it." (App. 55)

Although the testimony is not entirely clear, Williams described Bowman as bent over the edge of the twelfth floor ramp, facing the building, and pinned at the belt line between the hoist cage and ramp, eight inches away.[4]

According to Humphrey, the hoist operator, almost immediately after he started to lower the hoist cage in response to the bell signal, Williams said, "Hold it!" and then immediately said, "Raise the cage up a little bit." Williams testified that he only said, "Hold it." In any event, Humphrey raised the cage about two feet "and in a few seconds the man hit the ground" at the base of the shaft. (App. 24)[5]

The Safety Board official who investigated the accident and inspected the

---

3. The hoist was actually a double hoist, and the shaft was wide enough to accommodate two cars, but only one car was in operation on March 9, 1964.

4. It is not certain that Bowman was actually pinned, however. In response to the question, "Was it [the elevator] not already stopped when you saw him pinned and dangling?" Williams replied "He

was coming down with the cage.
\* \* \*"

5. Mr. Marginot also saw Bowman fall past him through the ramp opening on the eleventh floor, and immediately after, he saw the body lying at the base of the shaft. "He was doing a cartwheel going by the elevator hoist outside the elevator shaft that the bricklayers use."

twelfth floor found (a) "no door, no gate, or hinge bar or bolted bar" across the opening in the building on the twelfth floor, and (b) no "conspicuous copy of a signal system posted at the time of his arrival at the scene of the accident." This was evidence of violation by Redding of each of two regulations issued by the District of Columbia Minimum Wage and Industrial Safety Board:

> D–11–21105 Each entrance to a shaft shall be provided with a substantial door, gate or hinged bar. If a hinged or bolted bar is used, it shall be at least 18 inches from the line of travel of the extreme edge of the car or cage, and 36 inches above the platform level.
>
> \*　\*　\*　\*　\*　\*
>
> C–11–21106 (c) Safe Practices. (1) An effective, uniform signal system shall be used to signal operator and a conspicuous copy of such signal system shall be posted at each work level and at the operator's station.

Further evidence of violation of the regulations was provided by Marginot's testimony, but contradictory evidence was also introduced.

The trial judge granted appellees' motions for a directed verdict. By "indulging in all inferences favorable to the plaintiff" he concluded that a jury could reasonably find a violation of the two regulations. He ruled, however, that there was insufficient evidence for a finding that the violations were the proximate cause of Bowman's fatal fall or for a finding that the actions of Izzo's employee Williams were a proximate cause of Bowman's death. He further determined that in any case, Bowman was contributorily negligent as a matter of law.

## II. *The Causation Issues*

This appeal, from a judgment granting a directed verdict, must be considered "upon the view of the evidence most favorable to appellants." Aylor v. Intercounty Construction Corp., 127 U.S.App.D.C. 151, 153, 381 F.2d 930, 932 (1967). While the trial judge was obviously aware of this rule, we think he did not give effect to inferences reasonably to be drawn from appellant's case.

The judge concluded that negligence (whether of Izzo or Redding) in raising the hoist after decedent had been pinned was not established as the cause of death because decedent might already have been dead. Izzo's employee Williams admittedly saw Bowman dangling between the hoist and the ramp. If the jury were to believe the testimony of hoist operator Humphrey that Williams told him to raise the hoist, thereby unpinning Bowman and causing him to fall to his death, the facts would permit the jury to conclude a lack of reasonable care and bring in a verdict against Izzo. Contrariwise, if the jury believed that Williams only said "Hold it," as he testified, then Humphrey's action in raising the hoist in the face of a "hold" instruction from the person with vision of the hoist shaft, would provide a predicate for a verdict against Redding.

■ The general rule requires plaintiff in a negligence case to "prove sufficient facts, not only to warrant an inference of negligence, but also to justify an inference that such negligence was proximately related to the injury or death." Pennsylvania R. R. Co. v. Pomeroy, 99 U.S.App.D.C. 272, 281, 239 F.2d 435, 444 (1956), cert. denied, 353 U.S. 950, 77 S. Ct. 861, 1 L.Ed.2d 859 (1957).[6] The trial judge ruled, and Izzo urges on appeal, that the jury could only speculate or conjecture as to whether Williams's

6. *Cf.* Title 16 D.C.Code § 1201 (1961) (now 16 D.C.Code § 2701, 1967 ed.) which provides for an action for "Negligence Causing Death" when "　\*　\*　\* by an injury done or happening within the limits' of the District, the death of a person *is caused* by the wrongful act, neglect, or default of a person or corporation \*　\*　\*." (emphasis supplied).

behavior was a cause of Bowman's death because Bowman might already have been dead by the time Williams first saw him pinned between the hoist and the ramp. The same defense, if sound, would be applicable to Redding insofar as its liability is predicated on the act of the hoist operator.

### Error in excluding the autopsy report

Appellant attempted to introduce into evidence the autopsy report and death certificate, which, appellant claims, showed no injuries that could be attributable to Bowman's having been pinned. The trial court refused to receive them into evidence. American case law is divided on the admissibility of such documents. Cases excluding them usually emphasize the hearsay nature of such evidence. Cases admitting them are usually based on statutes requiring public officials to keep such records and making them presumptive evidence of the facts stated therein.[7]

■ This jurisdiction rejects the rule admitting these records in evidence automatically and as proof of all facts stated therein. Levy v. Vaughan, 42 App.D.C. 146 (1914); *see also* New York Life Ins. Co. v. Miller, 65 App.D.C. 129, 81 F.2d 263 (1935). However, in Labofish v. Berman, 60 App.D.C. 397, 55 F.2d 1022 (1932), we did attach significance to the fact that Congress has made death certificates public records and we said, "[W]e think they may be offered in evidence for the purpose of proving, prima facie, the time, place, and cause of death." 60 App.D.C. at 399, 55 F.2d at 1024. A satisfactory reconciliation of the divergent approaches in *Levy* and *Labofish* was made in *Miller,* where we noted that "in the Labofish Case the statement in the certificate as to the cause of death was not made upon hearsay evidence but * * * by the attending physician." 65 App.D.C. at 134, 81 F.2d at 268. In the present case, the rejected autopsy re-

port and death certificate's history of how the fall occurred are inadmissible under *Levy,* since they apparently rested on hearsay. But the autopsy report's "anatomical diagnosis" was not inadmissible, since it was based on direct examination of the deceased. It would be relevant to the question of the cause of death, which is a matter for jury determination when in doubt. Chesapeake Beach Ry. Co. v. Brez, 39 App.D.C. 58 (1912); Guenther v. Metropolitan R. R. Co., 23 App.D.C. 493 (1904). *Cf.* Kosberg v. Washington Hospital Center, Inc., 129 U.S.App.D.C. 322, 394 F.2d 947 (1968) (whether death was caused by shock treatment plus drug A, or by shock and a combination of drugs A and B). The rule is similar elsewhere. *See, e. g.,* Emery v. Northern Pacific R. R. Co., 407 F.2d 109 (8th Cir. 1969) (Last clear chance).

### General principle that plaintiff's claim of life continuing until terminated as a result of defendant's negligence presents jury question

■■ We conclude that this case is governed by the general guiding principle that a plaintiff's claim that his decedent's life continued, until terminated as a result of defendant's negligence, presents a question for the jury. The principle is undergirded by the more broadly applicable doctrine that in cases where the time of death is uncertain, there is a presumption of continuance of life.

"The federal rule, as we understand it, leaves the trier of fact free to rely on that presumption if the known circumstances are not strong enough for an affirmative finding that death occurred at some specific time." Acosta v. United States, 320 F.2d 382, 384, 162 Ct.Cl. 631, (1963). *See* 22 Am.Jur.2d, Death § 294 n. 9 (1965) for state cases. *Acosta,* like most of the presumption of life cases. dealt with the legal effect of a lengthy, unexplained disappearance. But the presumption has vitality in other areas.

---

7. *See* Annot. 21 A.L.R.3d 418, 426–429 (1968).

For example, in American Sugar Refining Co. v. Ned, 209 F.2d 636 (5th Cir. 1954), the deceased fell from a barge into the water after having complained of feeling sick. The court rejected the employer's contention that decedent might have died as a result of his illness, saying (209 F.2d at 638):

We are urged to hold as a matter of law that a living man who fell from a barge died from disease before he was asphyxiated by river water. Such a holding is not warranted by substantial evidence. There is a presumption in favor of the continuation of life until the contrary is shown.

We need not further explore the presumption of continued life as such. It suffices to focus on its special support, or application, for the rule applicable in negligence cases. The guiding principle establishes that a plaintiff's claim that his decedent's life continued, until terminated as a result of defendant's negligence, presents a question for the jury as trier of the facts.

The guiding principle is exemplified, in another "elevator" case, by our decision in Munsey v. Webb, 37 App.D.C. 185 (1911), aff'd, 231 U.S. 150, 34 S.Ct. 44, 58 L.Ed. 162 (1913). In that case deceased was riding in defendant's elevator and suddenly reeled and fell, for no apparent reason. The elevator door had been negligently left open so that his head stuck out over the edge of the car after the fall and was crushed between the floor of the car and a projecting floor. Defendant put it that deceased may have been dead as a result of his prior reeling and fall, before his head was crushed as a result of defendant's negligence. This court said (37 App.D.C. at 193):

It is urged that, from anything the record discloses, the deceased may have been dead before his head was caught between the floor of the building and the car. An autopsy was held, and there is testimony to the effect that the brain and heart were found to be in normal condition, and

that there was no indication of apoplexy or of a condition that would cause a fatal stroke. This, therefore, was a question of fact for the jury.

* * *

■ What we have identified as a guiding principle is not an absolute. The conclusion that life had already terminated may be so clear that it would be irrational, and a miscarriage of justice, to assign responsibility for death to defendant's subsequent impact, a result that cannot be mandated by the generality of presumption of continuance of life, or the scope that must widely be accorded the fact finder. There is no room in the case at bar for concluding that the counter-evidence so saturated the case that a jury could not rationally conclude there had been a continuance of life. Defendants lean on Marginot's testimony that he heard no scream while Bowman cartwheeled to the ground. The jury could rationally have concluded that silence was ascribable to shock or daze caused by the pinning. This item of evidence does not compel an excision from the general guiding principle sending the issue to the jury.

III. *"Last Clear Chance" Negligence In Raising Hoist*

■■ The trial judge also ruled that decedent was contributorily negligent as a matter of law, thereby barring appellant's claims against both defendants. We will subsequently discuss this ruling in more detail. But even assuming Bowman was chargeable with having contributed to his plight through his own negligence, in the first instance, the doctrine of last clear chance permits recovery for the violation of the duty of care owed to him when he was seen between the ramp and the cage, a duty owed him at that time regardless of any prior negligence. "Under the rule of last clear chance it is what the defendant did or failed to do after the plaintiff was imperiled that constitutes the breach of duty for which the defendant is held liable." Landfair v. Capital Transit Co., 83 U.S.App.D.C. 60, 61–62,

165 F.2d 255, 256–257 (1948). Under the last clear chance rule "if the defendant, in the exercise of reasonable care and prudence, could have avoided the injury, the contributory negligence of the party injured will not defeat his action." Kelly Furniture Co. v. Washington Ry. & Electric Co., 64 App.D.C. 215, 217, 76 F.2d 985, 987 (1935).[8] The facts of the case at bar entitled plaintiff to a jury verdict on the issue whether defendants could by reasonable care have avoided the death after deceased had come to a position of peril.

The facts do not entitle defendants to a ruling establishing as a matter of law that this case is governed by the qualification that holds the last clear chance doctrine "not applicable if the emergency is so sudden that there is no time to avoid the collision [or other accident], for the defendant is not required to act instantaneously." Dean v. Century Motors, 81 U.S.App.D.C. 9, 10, 154 F.2d 201, 202 (1946). In this case, defendants' employees not only had time to act, they did so. Whether or not the raising of the hoist reflected lack of reasonable care on the part of the employees of Redding, or Izzo, or neither, is a question for the jury to decide.

IV. *Redding's Liability Based on Violation of Hoist Safety Regulations; and Interrelated Defenses of Lack of Proximate Cause and of Contributory Negligence*

We think plaintiff was entitled to go to the jury on the claim of Redding's negligence with respect to the violations of the safety regulations. The trial court said he was constrained to grant a directed verdict to Redding on three grounds: (1) There was no evidence showing that Redding violated any duty owing to decedent under the existing circumstances as to the area where he came in contact with the cage of the hoist, since his work did not require

that he leave the building. (2) There was no evidence on which the jury could without speculation or conjecture find such violations to have been a proximate cause of the death, and the proof of violation of safety regulations does not supply evidence of proximate cause. (3) Under the circumstances, the decedent was contributorily negligent as a matter of law. We conclude that in various respects the trial court misapprehended the applicable doctrines.

*Safety violation as negligence per se to class of persons protected by the regulation*

 Violation of a duty set forth in a statute or code of safety provides a basis for a finding not only of negligence but also—when the injury that has in fact occurred is the very kind of harm the regulation was designed to prevent—for a finding of proximate cause.

The leading case in our jurisdiction on the significance and legal consequences of violation of safety regulations is Ross v. Hartman, 78 U.S.App. D.C. 217, 139 F.2d 14, 158 A.L.R. 1370 (1943), cert. denied, 321 U.S. 790, 64 S. Ct. 790, 88 L.Ed. 1080 (1944). In the *Ross* case the defendant left his keys in his truck after parking it in a public alley. A thief drove the truck away and within two hours ran down the plaintiff. In discussing the former District of Columbia regulation on locking the ignition, the court said:

> Since it is a safety measure, its violation was negligence. This negligence created the hazard and thereby brought about the harm which the ordinance was intended to prevent. It was therefore a legal or "proximate" cause of the harm. Both negligence and causation are too clear in this case, we think, for submission to a

---

8. *See generally*, W. Prosser, The Law of Torts § 65 (3d Ed.1964); Annot. 92 A.L.R. 47 (1934); *and* Annot. 171 A.L.R. 365 (1947).

*Cf.* Restatement (Second) of Torts, § 479, comment *g* (1965).

jury. 78 U.S.App.D.C. at 218–219, 139 F.2d at 15–16.

The fact that the intermeddler's conduct was itself a proximate cause of the harm, and was probably criminal, was immaterial. *Id.*

 The vitality of *Ross* is italicized by subsequent cases holding that negligence is established as a matter of law by a showing of violation of a statutory or regulatory standard that was erected or promulgated "to protect persons in the plaintiff's position or to prevent the type of accident that occurred." Richardson v. Gregory, 108 U.S.App.D. C. 263, 266, 281 F.2d 626, 629 (1960); Gaither v. Myers, 131 U.S.App.D.C. 216, 220, 404 F.2d 216, 220 (1968); H.R.H. Construction Corp. v. Conroy, 134 U.S. App.D.C. 7, 9, 411 F.2d 722, 724 (1969).

This rule is to be given broad application to effectuate legislative purpose. It would be niggled away to the border of triviality if every person identified as a safety violator were permitted to try to escape from identification as a tortfeasor on the ground that the particular plaintiff and his particular acts came under some factual or implied exception to the broad duty of care defined by the law or regulation. Of course, the *Ross* doctrine may not be pushed to the point of essential unfairness through reliance on technicality. This qualification, reiterated in *Ross* and *Conroy*, appeared in Peigh v. Baltimore & O. R. R. Co., 92 U.S.App.D.C. 198, 204 F.2d 391, 44 A.L. R.2d 671 (1953). *Peigh* points out there would be an essential unfairness in applying the doctrine for the benefit of someone who was wholly outside the class of persons protected by the regulation. But here the safety regulations must be taken at least as broadly as protecting all those whose business brought them to the building under construction and the zone of danger. Whether the particular actions of such persons negative liability on the ground of contributory negligence is a separate question, discussed below.

*Proximate cause*

A more complicated question is raised by the issue of proximate cause. In *Ross* the court held that proof of the violation supplied evidence of proximate cause,—and in that case the facts made out a case establishing proximate cause as a matter of law. Again in *Conroy* the court found that the record established "beyond doubt" that the safety violation caused the injury. But here again the *Ross* doctrine cannot be pushed to the point of essential unfairness. In Gaither v. Myers, *supra,* we reviewed the authorities and noted that the very violation discussed in *Ross* had been held in a later case, involving a collision occurring 15 months after the car-with-key had been stolen, to be "too remote from the collision in time, place and circumstances to be a proximate cause of plaintiffs' injuries." Casey v. Corson & Gruman Co., 95 U.S.App.D.C. 178, 179, 221 F.2d 51, 52 (1955). In still other cases, we noted, the issue of proximate cause had been left to the jury, as a means of tempering the rigor of the *Ross* rule. *See* cases cited at 131 U.S.App.D.C. at 221, n. 16, 404 F.2d at 221, n. 16.

 The practicable synthesis of the cases is that proof of a safety violation is itself evidence of proximate cause where the injury is generally of the kind intended to be avoided by the law or regulation involved. If that evidence is not rebutted or offset, proximate cause is established as a matter of law. Where other evidence provides an offset, proximate cause becomes an issue for the jury, or even in an extreme case, like *Casey*, a matter determined for defendant as a matter of law.

The purpose and nature of the regulation is also pertinent. In case of a traffic regulation, such as was discussed in *Richardson*, the violation defines a traffic negligence but the contemplation is that this statutory traffic negligence, like any common law traffic negligence, is not tantamount to liability unless

there is proof that it caused injury to the particular plaintiff.

 In the case at bar, the safety regulation itself envisions, and seeks to avoid, injury to a class of persons, here employees of a subcontractor, whose business brings them close in time, place and circumstance to the on-going violation. In such case the violation is itself proof of cause of injury, unless offset or rebutted as set forth above.[9]

### Contributory negligence

As to the issue of contributory negligence, plaintiff claims that this defense must be prohibited as inconsistent with the very purpose of the regulation.

The contention has not yet been directly discussed in the jurisprudence of the District of Columbia, although Hewitt v. Safeway Stores, Inc., 131 U.S. App.D.C. 270, 404 F.2d 1247 (1968), holding that the assumption of risk defense was barred as a matter of law by a Maryland safety statute, took into account that this was the trend of the modern cases. See also Restatement (Second) of Torts, § 496 F, comments d and e (1965).

A leading case is Osborne v. Salvation Army, 107 F.2d 929 (2d Cir. 1939). The plaintiff was cleaning defendant's windows but was not provided with certain safety devices prescribed by New York law. In reversing a judgment for defendant, the court, per Augustus N. Hand, J., ruled (107 F.2d at 931):

> We think that the plaintiff was within the class for whose protection Section 202 of the Labor Law was enacted and was entitled to a verdict in his favor unless the defendant had a defense of assumption of risk or contributory negligence. The better reasoned decisions have held that assumption of risk and contributory

negligence, which the trial judge allowed to go to the jury, are not valid defenses in cases where the violation of a statute enacted for the benefit of a class of which the plaintiff is a member is involved. If the plaintiff's injuries arose from the violation, defendant's liability was absolute irrespective of any proof of negligence.

Other courts have held that the defenses of contributory negligence and assumption of risk are still available unless the violated statute specifically precludes them. See Annot., 171 A.L.R. 894 (1947), 10 A.L.R.2d 853 (1950). Compare Restatement (Second) of Torts, § 483 (contributory negligence) with § 496 F (assumption of risk) (1965).

A leading commentator concludes that the essential inquiry, assuming that the plaintiff is a member of the protected class, is to determine the scope of the intended protection and to decide if the fundamental purpose of the statute or regulation would be defeated if plaintiff is permitted to assume the risk or if his contributory negligence can bar his action. See W. Prosser, The Law of Torts, 435–436 (contributory negligence), 468 (assumption of risk) (3d Ed., 1964) See also, Annot. 34 A.L.R.2d 1366, 1376 (1954) for safety regulation cases involving elevators and Annot. 17 A.L.R.2d 637, 645 (1951) for similar cases involving window washers.

 There may be a difference between the defenses of assumption of risk and contributory negligence in regard to the impact of safety regulation—a point that appears by implication in Hewitt,[10] though in Osborne and elsewhere the two defenses are lumped together as contrary to the legislative intention. Clearly, where a safety statute or regulation is designed to protect a class of people from a specific peril, it would eviscerate the safety policy to hold that an

9. As for Redding's claim that proximate cause is negatived because decedent's fall began on the roof, not on the twelfth foor, the point is at most a possible inference from the evidence entitling defendant to argue it to the jury.

10. After holding that the defense of assumption of risk was barred by the Maryland safety statute, we remanded for a new trial on the issue, inter alia, of contributory negligence. 131 U.S.App.D.C. at 273, 404 F.2d at 1250.

employee who had done all he reasonably could to protect himself must be held to have assumed the risk of that peril because his master's violation was peremptory or conspicuous.

The issue is more complicated when the defense of contributory negligence asserts that plaintiff acted unreasonably. If the underlying legislative policy is merely to assist those who are acting reasonably, the defense of contributory negligence may be given full application. However, if the underlying legislative policy is one that reflects an awareness that those being protected are likely to be careless, yet concludes they must be alerted and protected for the common good, the policy would be undermined by permitting their carelessness to be asserted as a defense. Even here the defense of contributory negligence may be available against a plaintiff who has been guilty of gross carelessness, amounting to recklessness. A safety system can be required to foresee and guard against the probability of occasional carelessness without having to extend protection to the case of reckless folly. But the availability of such a limited defense of "contributory recklessness" would ordinarily raise a matter for jury determination; and it would be a rare case indeed where the judge could hold the plaintiff's claim barred as a matter of law.

It may be interjected that a court that concludes that the policy of a particular safety regulation makes a violation actionable unless the plaintiff's negligence goes beyond carelessness to the point of recklessness has an analogue of precedent in the common law rule that refuses to bar recovery where plaintiff's negligence was minor in character as compared with negligence of defendant so great in degree as to constitute gross negligence or overriding cause. *See* Hayward v. Merrill, 94 Ill. 349 (1880), *cf.* S. & L. Co. v. Wood, 323 F.2d 322, 330 (8th Cir. 1963); Burger v. Omaha & C. B. St. Ry. Co., 139 Iowa 645, 117 N.W. 35 (1908).

Application of these general concepts to specific cases requires consideration of the contemplation and policy of the legislative rule involved. In the ordinary negligence case involving automobiles, the legislative policy underlying traffic and kindred regulations is discernible as one that is intended to clarify and define the elements of due care. But such regulations are not intended to affect legal doctrines holding that a vehicle operator guilty of negligence—whether ascertained by a jury applying the broad common law standard or by a particular legislative standard—is not liable to an individual whose own negligence materially contributed to his injury. In such cases the defense of contributory negligence stands unaffected. Richardson v. Gregory, *supra*.

 We turn now to consideration of the hoist safety regulations involved in this case. One regulation requires the bell code to be prominently displayed. It would palpably defeat the purpose of this regulation to claim a person was guilty of contributory negligence because he went into the hoist area without first having acquainted himself with the hoist code. The legislative protection extends not only to those working on the building day in and day out, but also to occasional visitors like Bowman. If his actions might have been affected by the presence of the hoist code, it would defeat the legislative purpose to defeat his remedy on the ground that even in the absence of that code he was negligent. In such event the defense of contributory negligence should be available only if he were chargeable with gross negligence amounting to recklessness.

The regulation providing for a safety bar obviously protects the unwary visitor from entering into a danger area without awareness of the danger. But it does not follow that a person is guilty of contributory negligence merely because he entered a danger area chargeable with knowledge of the danger. He may have had reason to do so in connection with his job. There was evidence

to support a jury inference that Bowman entered the hoist area in order to see whether caulking had been done. The trial judge said it was not "required" for Bowman to have done this. Assuming this was accurate, the ultimate question is whether it was reasonable for him to have entered the danger area. And this brings us to the possibility that a safety bar complying with the regulation would have provided an alert that enhanced the care taken by the visitor. Again, we think the legislative policy calls for a doctrine that bars the defense unless the plaintiff's conduct was negligent to the point of recklessness—either because he entered a danger area without any reason, or because his conduct therein was grossly imprudent.

Although Bowman would normally have stayed inside to do the caulking, the jury was entitled to find it was not reckless that he should step outside on the ramp to inspect the line of windows in order to see how many needed caulking, a judgment he could not reach on the inside because the windows were locked. He was not forbidden to use the ramp. The bar serves as an alert of danger. Had there been a bar across the opening, as required by the regulation, he might have been alerted to the extent of the peril, and have decided either that it was inadvisable or that he should first learn more of the perils of this area and the local ground rules.

Nor can it be said of Bowman as a matter of law that his conduct after entering the dangerous area was reckless, especially since he had not been informed of the hoist safety code. A code of signal bells on display would also have alerted this newcomer to the site that a three-bell signal meant the hoist was coming down. Viewing the evidence in the light most favorable to appellant compels reversal of a ruling that rejected the claim as a matter of law on the ground of contributory negligence.

## V. Shifting of Burden of Proof as to Which of Two Negligent Defendants Caused the Death

■■■ This court now faces the problem that plaintiff's proof may have established that both defendants were negligent—Redding because of the violations of the safety regulations, and Izzo because its servant caused the hoist to be raised—but have failed to establish, by a preponderance of the evidence, which one was the cause of death. We think it in the interest of justice to adopt the rule that a showing of negligence by each of two (or more) defendants with uncertainty as to which caused the harm does not defeat recovery but passes the burden to the tortfeasors for each to prove, if he can, that he did not cause the harm. That is the solution that was adopted by the American Law Institute, and set forth in § 433B of the Restatement (Second) of Torts (1965), which provides in pertinent part,

> (3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

■■■ Subsection (3) is an exception to the general rule that the plaintiff must establish by a preponderance of evidence that his injury was caused by defendant's tortious conduct. "[T]he reason for the exception is the injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." [11]

The provisions of subsection (3) are not to be gainsaid on the ground that they are contrary to the doctrine requir-

---

11. Restatement (Second) of Torts, § 433B, comment f (1965).

ing a showing of proximate cause. They are set forth as limited exceptions to that doctrine. These exceptions are supported by the interest of justice and are so limited and structured that it is evidence that they do not represent a disguised overturning or undermining of the main doctrine. So far as subsection (3) is concerned we are satisfied that it is fairly supported by precedents reaching the indicated result as in the interest of justice and consonant with sound common law.[12]

■ The effect of shifting the burden of proof to the defendants will only arise if the jury should decide that it is satisfied that plaintiff has established by a preponderance of the evidence that both defendants were wrongdoers, and that one or another was the cause of death,[13] but is unable to find from a preponderance of the evidence which defendant was a cause of death. Then the burden will shift to each defendant to absolve itself of liability, either for the purpose of avoiding a verdict for the plaintiff or for avoiding a claim of contribution by the other defendant. If neither defendant can prove it did not cause the death, they would both be liable.[14]

The judgment of the District Court is reversed and the case remanded for proceedings consistent with this opinon.

So ordered.

## On Appellee's Petition for Rehearing
## Supplemental Opinion

LEVENTHAL, Circuit Judge:

This opinion relates to two matters raised by the petition for rehearing filed by defendant-appellee Izzo.

12. The rule of subsection (3) is derived from the noted California case of Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948). *See* 40 ALI Proceedings 295 ff. (1963); Restatement (Second) of Torts § 433B, Illustration 9 (1965). There the plaintiff was injured by bird shot pellets when the two defendants with whom he was hunting simultaneously but not in concert negligently fired their weapons in his direction. The court ruled:

"When we consider the relative position of the parties and the results that would flow if plaintiff was required to pin the injury on one of the defendants only, a requirement that the burden of proof on that subject be shifted to defendants becomes manifest. They are both wrongdoers—both negligent toward plaintiff. They brought about a situation where the negligence of one of them injured the plaintif, hence it should rest with them each to absolve himself if he can. * * * Ordinarily defendants are in a far better position to offer evidence to determine which one caused the injury." 33 Cal.2d at 86, 199 P.2d at 4.

The approach of Summers v. Tice is in accord with a number of other cases we have examined, including cases where the plaintiff was not a member of the hunting party. The citations are available in 3 Appendix, Restatement (Second) of Torts, § 433B (Illustration 9) at 144 (1966); 2 Harper & James, The Law of Torts § 20.2 at 1116 n. 24 (1956); W. Prosser, The Law of Torts, § 41 at 247

(1964); Annot. 5 A.L.R.2d 98, 99–100 (1949).

Another typical fact situation presenting the same problem is the multiple automobile collision, where, after an initial negligently caused collision, another negligently driven car piles into the wreck, and somewhere in the process plaintiff is injured. *See, e. g.,* Restatement (Second) of Torts § 433B, Illustation 11; Cummings v. Kendall, 41 Cal. App.2d 549, 107 P.2d 282 (1940); Murphy v. Taxicabs of Louisville, Inc., 330 S.W.2d 395 (Ky.1959); *cf.* Micelli v. Hirsch, 83 N.E.2d 240 (Ohio App. 1948) (plaintiff killed; presumption of continuing life); Eramdjian v. Interstate Bakery Corp., 153 Cal.App.2d 590, 315 P.2d 19 (1957).

The doctrine may fairly be applied to other fact situations. Compare the use of the res ipsa loquitur doctrine in Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687 (1944) (injury caused to unconscious plaintiff in operating room where several physicians and nurses were present).

13. This would include a determination that either decedent was free from contributory negligence, or that the negligence of the particular defendant arose from lack of due care under conditions (last clear chance) appearing subsequent to the negligence of the decedent.

14. *See generally,* Annot., 100 A.L.R.2d 16, § 9 (1965); Apodaca v. Haworth, 206 Cal.App.2d 209, 23 Cal.Rptr. 461 (1962).

## A.

Izzo says the last clear chance doctrine may not properly be applied so as to impose liability on a defendant for its actions concerning a person in a perilous situation unless the defendant's negligence contributed to the perilous situation.

There is language supporting Izzo's view in Dean v. Century Motors, 81 U.S. App.D.C. 9, 10, 154 F.2d 201, 202 (1946): "The doctrine [last clear chance] presupposes a perilous situation created or existing through the negligence of both the plaintiff and the defendant, but assumes that there was a time after such negligence had occurred when the defendant could, and the plaintiff could not, by the use of means available, avoid the accident. It is not applicable if the emergency is so sudden that there is no time to avoid the collision, for the defendant is not required to act instantaneously." [Footnotes omitted.] The other cases of this court cited by Izzo are all opinions quoting or paraphrasing this language in Dean.

The language in Dean that there is no scope for the last clear chance doctrine unless the defendant contributed to the perilous situation of the plaintiff has

vitality for those cases, like that considered in Dean where there was a last-minute emergency and defendant had no opportunity to change his course after he became aware or could reasonably have been expected to have become aware of the peril. In such a situation there is no post-peril negligence on the part of defendant, in view of the emergency exception to the last clear chance doctrine for which we cited Dean in our original opinion. Hence there is no liability unless there was pre-peril negligence which continued after the period became observable. Most of the cases citing Dean refer to this situation.[1]

The pre-Dean cases stated the rule that last clear chance negligence overrides the defense of contributory negligence without any qualification in terms of a requirement of defendant's negligence preceding the emergence of the peril,[2] as appears, for example, from Judge Miller's opinion in Jackson v. Capital Transit Co., 69 App.D.C. 147, 149, 99 F.2d 380, 382 (1938),[3] cert. denied, 306 U.S. 630,, 59 S.Ct. 464, 83 L.Ed. 1032 (1939).

The Dean case and most of the post-Dean cases quoting or paraphrasing the Dean language (supra, note 2) were focused on the "sudden emergency" or "no

---

1. Capital Transit Co. v. Grimes, 82 U.S. App.D.C. 393, 164 F.2d 718 (1947), cert. denied 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1129 (1948) ; Landfair v. Capital Transit Co., 83 U.S.App.D.C. 60, 165 F.2d 255 (1948) ; Gay v. Augur, 97 U.S. App.D.C. 336, 231 F.2d 495 (1956) ; Matthews v. Lindsay, 108 U.S.App.D.C. 292, 281 F.2d 927 (1960) ; Law v. Virginia Stage Lines, Inc., 144 U.S.App. D.C. 115, 444 F.2d 990 (May 13, 1971).

2. See, e. g., Kelly Furniture Co. v. Washington Ry. & Electric Co., 64 App.D.C. 215, 217, 76 F.2d 985, 987 (1935) ; Cobb v. Capital Transit Co., 79 U.S.App. D.C. 364, 365 n. 1, 148 F.2d 217, 218 n. 1 (1945) ; Cullen v. Baltimore & P. R. R. Co., 8 App.D.C. 69, 73 (1896) ; Hawley v. Columbia Ry., 25 App.D.C. 1, 5 (1905).

3. "One operating a streetcar in a lawful manner, and giving proper and sufficient warning signals of its approach, may assume that a pedestrian upon, or drawing

near to, the track will respect the preferential right of the streetcar, and have sufficient care for his own safety, to take notice and leave the track, or stop and let the car pass ; although this assumption may be indulged only until something appears which makes it evident, or by the exercise of diligence should make it evident, to the operator that the pedestrian is in a position of peril and that to proceed will result in a collision.

"The sole issue of the case, therefore, may be stated in the following question : Was there evidence to show that (1) the deceased was in a position of danger ; (2) he was oblivious of his danger ; (3) the motorman was aware, or by the exercise of reasonable care should have been aware, of deceased's danger and obliviousness ; (4) the motorman was able to stop the car and avoid striking the deceased after he became aware, or should have become aware, of this danger and obliviousness and failed to do so? If so, then the case should have gone to the jury."

clear chance" fact situations where defendant could not be charged with any negligence after plaintiff's peril became or should have become apparent. In our other cases citing *Dean* defendant's negligence preceded the creation of plaintiff's position of peril, and defendant was held liable.[4]

In our *Law* opinion, decided May 13, 1971, (*supra* note 1) Judge McGowan's opinion, concurred in by Judge Miller, cited *Dean* for the proposition that in general the last clear chance doctrine is "an ameliorative one applicable in the circumstances where both parties to an accident have some portion of culpability." There was no statement of a general requirement that defendant's negligence have contributed to the perilous situation in the first instance. And there is no such general requirement, apart from situations like the "sudden emergency" case with which *Dean* was concerned.

▌ The rule is that under the last clear chance doctrine, in the absence of a sudden emergency or other situation negativing "clear chance" for the defendant, defendant is liable for failure to exercise reasonable care in avoiding a harm to which plaintiff exposed himself, and defendant's liability is not dependent on a showing of negligence on the part of defendant prior to the time he discovered or should have discovered plaintiff's peril. That rule is expressly set forth in the Restatement,[5] it is sound, it is the thrust of our opinions establishing the last clear chance doctrine (see notes 2 & 3), and it is consistent with *Dean* and our post-*Dean* decisions.[6] Nothing in the authorities cited by defendant Izzo leads to the contrary result.[7]

---

4. Richardson v. Gregory, 108 U.S.App.D.C. 263, 281 F.2d 626 (1960); Conlon v. Tennant, 110 U.S.App.D.C. 140, 289 F.2d 881 (1961). Hence the statement that antecedent defendant liability was required to establish liability was dictum.

5. Restatement (Second) of Torts § 479 (1965) provides:
 "A plaintiff who has negligently subjected himself to a risk of harm from the defendant's subsequent negligence may recover for harm caused thereby if, immediately preceding the harm,
 (a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care, and
 (b) the defendant is negligent in failing to utilize with reasonable care and competence his then existing opportunity to avoid the harm, when he
 (i) knows of the plaintiff's situation and realizes or has reason to realize the peril involved in it. * * * *"
 Comment *g* says,
 "It is not necessary that the defendant have been negligent prior to the time at which he discovered or should have discovered the dangerous position in which the plaintiff had negligently put himself. It is enough that thereafter he fails to utilize with reasonable care the ability which he then has to avert the plaintiff's harm."

6. See text to notes 1 and 4. We have found no case in which this court has

exonerated a defendant who saw plaintiff's danger, was not beset by sudden emergency, yet failed to use his then existing opportunity to avoid the harm, on the ground that the last clear chance doctrine was inapplicable because defendant was not negligent before plaintiff's negligence put him in peril. In Broderick v. Gletner, 249 A.2d 738 (D.C. App.1969), it is not clear whether or not the defendant was confronted with a sudden emergency. If there was none the court extended the *Dean* language, repeated in Richardson v. Gregory, beyond the fact situation in which that language may soundly be applied.

7. We have restudied Annot. 171 A.L.R. 365 (1947), quoted by Izzo. It properly emphasizes that the last clear chance doctrine cannot of itself raise a duty on a defendant's part. Thus, the court cannot hold a track guard on the ground he should have discovered a tramp's peril if he had no duty to look for tramps.
 If anything defendant's position is undercut by the statement, 171 A.L.R. at 365–366: "Its only proper scope and function is to relieve the plaintiff from the consequences and effect of the general rule of contributory negligence, upon the assumption that he establishes independently a breach of duty on the part of defendant *which originated or continued after the injured person's peril arose.*" (Emphasis added.) As the forerunner annotation notes, the doctrine of last

### B.

Appellee Izzo also insists that in the absence of interpretive evidence, the autopsy report was not probative on the issue whether the injuries which resulted in death were attributable to the pinning or to the fall.

Appellant argued to this court that the disclosure in the autopsy report that decedent received fractures of the cervical spine, ribs (multiple), liver, pelvis and right femur, showed (by omission) that he did not receive fractures or injuries to his neck or to his head, and that this was probative that he died from the fall and the resulting impact rather than from pinning by the hoist. This point was not expressly discussed by the trial judge. The trial judge did not rule on the autopsy report when it was offered Its exclusion was one of a number of rulings, all going against plaintiff, that were included in the direction of a verdict for defendants.

While plaintiff's inference from the autopsy report is not without merit, we conclude, on further reflection, that it is in the interest of justice that we should not make a ruling requiring its admission without interpretive evidence, but should rather assure that plaintiff be given a clear-cut opportunity on retrial, with the other adverse rulings out of the way, to supply interpretive evidence in addition to the autopsy report, in the event that the trial judge who comes to focus on this issue determines that the autopsy report is not sufficiently meaningful by itself to put to the jury in the absence of such interpretive evidence.

Our order will provide for remand to the District Court consistent with our opinion as supplemented herein.

So ordered.

---

clear chance "cannot rest upon a breach of duty on defendant's part * * * before the time when the peril arose." Annot. 92 A.L.R. 47, 57 (1934). There is nothing in these annotations to indicate that such an antecedent breach of duty by defendant is a requirement of recovery. The cases are concerned with insisting that "prior or antecedent negligence" does not suffice for recovery, and sometimes go so far as to say that no such negligence "enters into the [last clear chance] doctrine. That doctrine

blots out all that preceded * * *." Gray v. Columbia Terminals Co., 231 Mo. 73, 52 S.W.2d 809, 813 (1932).

On the question whether defendant's duty "originated or continued" after the discovery of plaintiff's peril, we know that in this case, Izzo's employee saw the plaintiff and took action. Whether this involved a breach of the duty of due care owed someone engaged in business on the premises is a question for the jury.